**FILED**
**CLERK**

9/12/2019 1:28 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
KEVIN LUGO,

                        Plaintiff,

         -against-

ANDREW SAUL,[1]
Commissioner of Social Security,

                      Defendant.

-----------------------------------------------------------------X

For Online Publication Only

**<u>MEMORANDUM & ORDER</u>**
17-CV-3453 (JMA)

**APPEARANCES**

      Law Offices of Joseph A. Romano, P.C.
      1776 Eastchester Road, Suite 210
      Bronx, New York 10461
      *Attorney for Plaintiff*

      Sean P. Greene
      United States Attorney's Office, EDNY
      271 Cadman Plaza East
      Brooklyn, NY 11201
      *Attorney for Defendant*

**AZRACK, United States District Judge:**

      Plaintiff Kevin Lugo ("Plaintiff") seeks review of the final decision by the Commissioner of Social Security, reached after a hearing before an administrative law judge, denying Plaintiff disability insurance benefits under Title II of the Social Security Act (the "Act"). Before the Court are the parties' cross-motions for judgment on the pleadings. (ECF Nos. 11, 19.) Because the administrative law judge's ("ALJ") decision was supported by substantial evidence and applied the proper legal standards, Plaintiff's motion for judgment on the pleadings is DENIED, and defendant's cross-motion is GRANTED.

---

[1] Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted for Acting Commissioner Carolyn Colvin as the defendant in this suit.

# I. BACKGROUND

## A. Procedural History

On October 1, 2013, Plaintiff filed an application for disability insurance benefits, alleging disability as of November 1, 2012 due to a herniated disc. (Tr. 54, 119–20.[2]) Following the denial of his application on November 27, 2013, Plaintiff requested a hearing and appeared with his attorney for an administrative hearing before Administrative Law Judge April M. Wexler ("ALJ Wexler") on May 13, 2015. (Tr. 70–75, 35–53.)

In a decision dated May 26, 2015, ALJ Wexler denied Plaintiff's claim, finding that he was not disabled under the Act. (Tr. 15–34.) Plaintiff timely filed a request for review before the Appeals Council. (Tr. 13–14.) ALJ Wexler's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request on September 27, 2016. (Tr. 1–6.) This appeal followed.

## B. Plaintiff's Background and Testimony

Plaintiff, who has a high school diploma, was twenty-five years old as of his alleged onset date. (See Tr. 39, 119, 139.) He was working as an iron worker when he fell twenty feet from temporary scaffolding in August 2011 and injured his back. (Tr. 39–41, 181.) He has not worked since his alleged onset date of November 1, 2012. (Tr. 39–41.) Plaintiff underwent lumbar spine fusion surgery on March 29, 2013 to address his back injury. (Tr. 244, 249–51.)

At the administrative hearing held on May 13, 2015, Plaintiff testified that since his surgery, he has gone to physical therapy, received injections, and taken prescription medication to treat his persistent back pain. (Tr. 41–42.) Plaintiff stated that he engages in minimal activities and, although he tries to walk around as much as possible, he can generally only walk two blocks before needing to sit down. (Tr. 43–44.) Plaintiff further testified that after thirty minutes of

---

[2] Citations to "Tr." refer to pages of the certified administrative record filed by the Commissioner. (ECF No. 10.)

sitting or standing, he has to stretch. (Tr. 45–46.) He indicated that while he does not use any kind of assistive device for walking, he occasionally wears a back brace when engaging in particularly strenuous activities such as driving. (Tr. 44.) However, Plaintiff stated that he drives himself to doctors' appointments and can dress himself and bathe with the assistance of a shower chair. (Tr. 44–45.) Plaintiff also reported that he gets drowsy from the medications that he takes every few hours.[3] (Tr. 45.)

## C. Relevant Medical Evidence

### 1. Patients First Family Medical Care

Soon after his accident, but prior to his alleged onset date, Plaintiff visited his general practitioner's office. (Tr. 181–84.) Dr. Glen Marin noted Plaintiff's decreased range of motion and pain in his back, gave him Vicoprofen for pain, and opined that Plaintiff was disabled. (Id.) Plaintiff returned to Patients First a couple more times before his alleged onset date and was advised to see a neurosurgeon. (Tr. 185–86.) On March 21, 2013 (just prior to his surgery), Plaintiff was assessed by Dr. July Gaysynsky. (Tr. 187–90.) Dr. Gaysynsky noted Plaintiff's normal gait and motor strength, diagnosed Plaintiff with low back pain, and cleared him for surgery. (Id.) Dr. Gaysynsky also opined that, at that time, Plaintiff was disabled. (Tr. 190.)

### 2. Neurological Specialties of Long Island, PLLC

Plaintiff also saw two neurologists at Neurological Specialties of Long Island prior to his alleged onset date and received trigger point injections. (Tr. 167–69, 177.) During the only visit during the alleged period of disability, on January 12, 2013, the neurologist noted Plaintiff's disc herniation and his forthcoming scheduled surgery. (Tr. 178–79.)

---

[3] Plaintiff testified that he takes Vicoden, Baclofen, Duexcis, and Trazadone. (Tr. 41–42.)

### 3. Michael Lefkowitz, M.D.

Dr. Lefkowitz, the neurosurgeon who performed Plaintiff's surgery first saw Plaintiff on January 21, 2013. (Tr. 270–71, 273–76.) Dr. Lefkowitz reported that Plaintiff experienced tingling, numbness, and weakness down his right leg, as well as back pain. (Tr. 273.) He also noted that Plaintiff's gait was antalgic[4] and that a November 30, 2012 MRI demonstrated L4-5 spondylolisthesis with degenerative disc disease and large central/right paracentral disc herniation. (Tr. 274.) Dr. Lefkowitz compared this MRI to a June 29, 2012 MRI (which demonstrated minimal L4-5 retrolisthesis and a small L4-5 disc bulge) and opined that there was a worsening of Plaintiff's condition, warranting surgery. (Id.)

On March 29, 2013, Dr. Lefkowitz surgically performed an L4-5 posterior lumbar spine fusion on Plaintiff. (Tr. 244, 249–51.) Five days after the procedure, Plaintiff visited Dr. Lefkowitz for a post-operative follow-up appointment. (Tr. 242.) Dr. Lefkowitz reported that Plaintiff was doing well and had little low back pain. (Id.) He noted that Plaintiff was nontender to palpation, and the lumbar incisions were "well healed." (Id.) Plaintiff had full motor strength and was able to ambulate independently but used a cane for longer distances. (Id.) Two months later, on June 4, 2013, Plaintiff returned to Dr. Lefkowitz who again noted that Plaintiff had done well since his surgery and reported no significant back or leg pain. (Tr. 236–340.) He indicated that Plaintiff's back was nontender to palpation and he had full motor strength. (Id.) A lumbar spine x-ray series demonstrated that the post-operative changes showed good spinal alignment and evidence of fusion in progress. (Tr. 236.)

---

[4] Antalgic is defined as "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)." See "antalgic." Merriam-Webster Online Dictionary, 2019. https://www.merriam-webster.com/medical/antalgic (last visited Sept. 5, 2019).

Dr. Lefkowitz next examined Plaintiff on September 12, 2013. (Tr. 219–21.) He reported that Plaintiff had done well since the surgery and had occasional low back pain and no leg pain. (Id.) At this visit, Plaintiff's back was slightly tender to palpation. (Id.) However, Dr. Lefkowitz noted that Plaintiff's incisions were well healed, and he showed full motor strength and had a normal gait. (Id.) Upon review of a CT scan from September 12, 2013, Dr. Lefkowitz noted evidence of a good fusion in progress, implant placement, and spinal alignment. (Id.)

Dr. Lefkowitz saw Plaintiff twice more—in November 2013 and January 2014—and reported similarly positive findings. (Tr. 216–17, 290–91.) During Plaintiff's final documented visit, on January 28, 2014 (nearly a year after his surgery), Dr. Lefkowitz reported that Plaintiff was doing well with no back or leg pain. (Tr. 290.) Plaintiff had a normal gait, no tenderness to palpation, intact sensation, and full motor strength. (Id.) Dr. Lefkowitz also noted that Plaintiff had taken a break from physical therapy and had not yet completed treatment, but that he was going on a weekly basis again. (Id.) Dr. Lefkowitz recommended that Plaintiff complete his physical therapy and noted that Plaintiff could return to see him on an as-needed basis. (Id.)

### 4. Workers' Compensation Examiners[5]

#### i. Johnathan Glassman, M.D.

Plaintiff visited orthopedic surgeon Dr. Jonathan Glassman for independent medical evaluations on behalf of the Workers' Compensation Board twice: once prior to his alleged onset date, and then again just prior to his surgery. (Tr. 192–201.) In the visit before Plaintiff's alleged onset date, Dr. Glassman opined that Plaintiff had a mild partial temporary disability but could work with certain restrictions. (Tr. 195.) Then, on March 11, 2013, Dr. Glassman opined that

---

[5] Because Plaintiff was injured at work and filed for Workers' Compensation benefits, he was evaluated by Workers' Compensation Examiners, and it appears that most of his physicians prepared reports and issued opinions for the Workers' Compensation Board. The records from the three doctors under this subheading expressly indicate that they provided independent examinations for the Workers' Compensation Board.

Plaintiff had a moderate partial temporary disability but could work so long as he did not lift more than twenty pounds, repetitively bend at the waist, sit or stand for longer than sixty minutes, or walk for more than fifteen minutes without a seven-minute rest period. (Tr. 200.) Plaintiff did not return to Dr. Glassman for an assessment after his surgery.

### ii. Gary Kelman, M.D.

Plaintiff saw Dr. Kelman, an orthopedic surgeon, for an independent examination on behalf of the Workers' Compensation Board on August 6, 2013. (Tr. 227–35.) Plaintiff complained of aching and pulling lower back pain. (Tr. 229.) Plaintiff said he could walk two blocks without "experiencing too much pain" and could sit for thirty to sixty minutes at a time. (Id.) Dr. Kelman observed that Plaintiff had a normal gait and minimal to moderate paraspinal tenderness upon bilateral palpation. (Id.) He also assessed normal muscle strength and no deficits in sensory responses or reflexes. (Id.) Dr. Kelman diagnosed Plaintiff with a lumbar spine sprain/strain. (Tr. 230.) Pursuant to the Workers' Compensation Board guidelines, Dr. Kelman opined that Plaintiff evidenced a moderate disability, but could return to work with the following restrictions: avoiding lifting objects weighing greater than twenty pounds and working on vertical ladders; no prolonged walking or standing, stair climbing; and no squatting or repetitive bending. (Id.)

### iii. Naunihal Singh, M.D.

Several months later, on January 14, 2014, Dr. Singh, a neurologist, performed an independent neurological evaluation of Plaintiff for the Workers' Compensation Board. (Tr. 281–86.) At the examination, Plaintiff stated that he had lower back pain and leg weakness, no radiation of pain to his legs, occasional numbness in his left leg, and could sit, stand, and walk for ten minutes at a time. (Tr. 282.) Dr. Singh noted no paravertebral muscle tenderness or spasm on either the left or right side. (Tr. 283.) The range of motion of Plaintiff's cervical spine showed

normal flexion and extension, normal right and left lateral flexion, and normal right and left lateral rotation. (Id.) Palpation of the lateral spine revealed minimal vertebral tenderness, and there was minimal paraspinal muscle tenderness on the right and left sides. (Tr. 284.) Dr. Singh also noted limited range of motion of the lumbar spine. (Id.) While Dr. Singh noted that Plaintiff's supine straight leg raising test demonstrated a limited range of motion, Plaintiff's sitting straight leg-raising test was normal, and he had full muscle strength, a normal gait, and did not require an assistive device to ambulate. (Tr. 284–85.) Dr. Singh diagnosed Plaintiff as "Status-post lumbar spine fusion with limited mobility of the spine" and opined that Plaintiff has a moderate neurological disability but was capable of sedentary work. (Tr. 284–86.)

### 5. Aric Hausknecht, M.D.

That same day of Plaintiff's visit to Dr. Kelman, August 6, 2013, he visited Dr. Hauskenecht, a neurologist. (Tr. 298–301.) At this visit, Plaintiff complained of lower back pain that interfered with his ability to sit, bend, and lift. (Tr. 299.) Contrary to the examination by Dr. Kelman, as referenced supra, Dr. Hausknecht reported that Plaintiff's gait was antalgic, and he indicated that Plaintiff experienced lumbago.[6] (Tr. 301.) While Dr. Hausknecht indicated that Plaintiff had full motor strength, he noted Plaintiff had lumbosacral paravertebral tenderness and associated muscular spasms, as well as a positive seated straight leg raising test. (Tr. 300.) Dr. Hausknecht opined that Plaintiff had a temporary total disability. (Tr. 301.)

Dr. Hausknecht saw Plaintiff again on March 11, 2014. (Tr. 302–03.) At this visit, Plaintiff complained of lower back pain, numbness in his left thigh, and weakness in both legs. (Tr. 302.) Upon examination, Dr. Hausknecht noted that Plaintiff's reflexes were "somewhat brisk at the knees and dampened at the ankles but otherwise intact," that Plaintiff had lumbosacral

---

[6] Lumbago refers to acute or chronic pain in the lower back. See "lumbago." Merriam-Webster Online Dictionary, 2019. https://www.merriam-webster.com/dictionary/lumbago (last visited Sept. 5, 2019).

paravertebral tenderness, a positive seated straight leg raising test, and that Plaintiff expressed thirty-three percent loss of forward flexion in the lumbar spine. (Id.) Dr. Hausknecht again opined that Plaintiff had a temporary total disability and prescribed a lumbar support. (Tr. 303.)

### 6. Comprehensive Pain Management Anesthesia Services

Plaintiff visited pain management specialists, Dr. Gary P. Thomas and Dr. Chaim Mandelbaum, at Comprehensive Pain Management between January 2014 and April 2015. (Tr. 293–96, 305–08, 349–69, 388–413, 421–67.) Upon initial examination of Plaintiff's lumbar spine on January 30, 2014, Dr. Thomas assessed pain and spasms on palpation of L3-S1, and facet joint pain along L3-4, L4-5, and L5-S1. (Tr. 294.) Plaintiff demonstrated some limited range of motion with pain and a positive straight leg raise at 30 degrees, but his motor strength was 4+/5. (Id.) Dr. Thomas also noted reduced pinprick sensations in Plaintiff's lower extremity as well as an antalgic gait. (Id.) He then administered a lumbar diagnostic facet/dorsal median nerve block at the lumbar spine along L3-L4, L4-L5, and L5-S1 which Plaintiff said reduced his pain by approximately 80%. (Tr. 295.)

Dr. Thomas submitted his "Doctor's Initial Report" form to the Workers' Compensation Board in which he opined that Plaintiff was temporarily impaired and indicated that Plaintiff could not return to work at that time. (Tr. 421–24.) The form did not identify any specific limitations on Plaintiff's activity but noted that Plaintiff's prescribed medications cause drowsiness. (Tr. 423.)

Over the next fifteen months, Plaintiff returned to Dr. Thomas and Dr. Mandelbaum every month or two. Each time, the doctors reported nearly identical assessments of Plaintiff's lumbar spine, but by November 2014, Plaintiff was consistently demonstrating 5/5 motor strength on his left side (his right side remained steady at 4+/5). (See Tr. 398.) Plaintiff received additional injections in January 2015, which he indicated reduced his pain and gave him a greater ability to

perform daily activities. (Tr. 441–42, 446–48, 452.) There are no reports that Plaintiff was experiencing side-effects from his medication. Indeed, several office notes specifically indicate that Plaintiff was tolerating his medications well and was <u>not</u> experiencing any side-effects. (<u>See</u> Tr. 305, 397, 452.) In addition, the progress reports that Dr. Thomas and Dr. Mandelbaum provided to the Workers' Compensation Board note that Plaintiff was temporarily disabled and could not return to work, but do not identify any specific limitations for Plaintiff, or report side-effects from his medications.

### 7. Barry Katzman, M.D.

On December 15, 2014, Plaintiff visited Dr. Katzman, an orthopedic surgeon. (Tr. 419–20.) Dr. Katzman noted that Plaintiff had limited flexion and extension of his lumbar spine, limited rotation and lateral bending, and was tender to palpation of the lumbar spine. (Tr. 419.) Dr. Katzman opined that Plaintiff would "probably never" return to work as an iron worker, but that he may benefit from vocational rehabilitation. (Tr. 420.) In forms submitted to the Workers' Compensation Board, Dr. Katzman opined that Plaintiff was temporarily impaired. (Tr. 415–18.)

### D. **The Vocational Expert Testimony**

Vocational expert Christina Boardman (the "VE") testified at the administrative hearing. (Tr. 47–52.) She noted Plaintiff's past relevant work as an iron worker is a heavy exertional level job, and his other relevant work was either classified as medium or heavy. (Tr. 48–49.) ALJ Wexler asked the VE to consider a hypothetical individual with the same age and education as Plaintiff, but who is limited to sedentary work except they can never kneel, crouch, or crawl. (Tr. 49.) The VE testified that, consistent with the Dictionary of Occupational Titles ("DOT"), this hypothetical individual could not perform Plaintiff's past relevant work, but could perform the jobs of order clerk, food checker, or table worker. (<u>Id.</u>) ALJ Wexler then questioned what would

happen if the hypothetical individual would need a break of five minutes each hour to change positions and then return to sitting. (Tr. 49–50.) In response, the VE stated that this hypothetical individual could still perform the jobs she just described. (Tr. 50.)

## E. **ALJ Wexler's Decision**

ALJ Wexler issued her decision on May 26, 2015, applying the five-step process described below, pursuant to 20 C.F.R. § 404.1520. (Tr. 15–34.) At step one, ALJ Wexler concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 1, 2012. (Tr. 20.) At step two, ALJ Wexler found that Plaintiff's status post lumbar fusion was a severe impairment. (Id.) At step three, ALJ Wexler determined that Plaintiff's impairments, alone or in combination, do not meet or medically equal the severity of any of the regulations' listed impairments, specifically considering Listing 1.04 (Disorders of the Spine). (Tr. 21.)

ALJ Wexler then addressed step four, first determining Plaintiff's residual functioning capacity ("RFC"). An RFC determination identifies what work a claimant can still perform, despite his limitations. See C.F.R. § 404.1545. ALJ Wexler found that Plaintiff retained the RFC to perform sedentary work,[7] except that he can never kneel, crouch, or crawl; and would require a break of five minutes each hour to change positions. (Tr. 21.)

At this step, ALJ Wexler spent a great deal of time analyzing Plaintiff's medical records and testimony at the hearing. (See Tr. 21–29.) Her detailed analysis led to the conclusion that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible given the medical record. (Tr. 22.)

---

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Based on the RFC and the testimony of the VE, ALJ Wexler concluded at step four that Plaintiff is not capable of performing any past relevant work.  (Tr. 29.)  Turning to step five, ALJ Wexler again relied on the testimony of the VE to find that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (Id.)  Accordingly, ALJ Wexler concluded that Plaintiff was not under a disability as defined in the Act from November 1, 2012 through the date of her decision.  (Tr. 30.)

## II. DISCUSSION

### A. Social Security Disability Standard

Under the Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability.  See 20 C.F.R. § 404.1520.  The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Brugess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).  At step four, the Commissioner determines

the claimant's RFC before deciding if the claimant can continue in his or her prior type of work. 20 C.F.R. § 404.1520(a)(4)(iv).  The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate that "there is work in the national economy that the claimant can do."  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

**B.  Scope of Review**

In reviewing a denial of disability benefits by the Social Security Administration ("SSA"), it is not the function of the Court to review the record de novo, but to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvior v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1984) (per curiam)).  Thus, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it."  State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990).  An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

Conversely, a remand for further proceedings is warranted in cases where the Commissioner has failed to provide a full and fair hearing, to make sufficient findings, or to have correctly applied the law and regulations.  See Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir.

1999); see also 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

## C. Analysis

Plaintiff's brief, though a bit muddled, appears to make four arguments in support of his appeal of ALJ Wexler's decision. He argues that: (1) ALJ Wexler erred at step three in finding that Plaintiff's impairments did not meet or medically equal a listed impairment; (2) ALJ Wexler's RFC finding was not supported by substantial evidence; (3) ALJ Wexler improperly assessed Plaintiff's credibility; and (4) Plaintiff cannot perform sedentary work because of the side-effects of his medication. (Pl.'s Mem., ECF No. 12 at 6–13.) None of these arguments have any merit.

### 1. ALJ Wexler Did Not Err at Step Three

At step three in the analysis, Plaintiff bears the burden to establish that his impairments meet or medically equal a listed impairment. See Campbell v. Astrue, No. 12-CV-5051, 2015 WL 1650942, at *7 (E.D.N.Y. Apr. 13, 2015) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) (noting that the plaintiff bears the burden of proof at the first four steps). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." Sullivan v. Zebley, 493 U.S. 521, 531 (1990) (internal quotations omitted) (emphasis in original); see also 20 C.F.R. § 404.1525(c)(3). "[A]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan, 493 U.S. at 530 (citation omitted).

ALJ Wexler found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Pt. 404, Subpt. P, Appendix 1." (Tr. 21.) Plaintiff contends that ALJ Wexler erred in making this determination because the record supports a finding that his impairments meet equal Listing 1.04, which requires the following:

> A disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> (B) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or
>
> (C) Lumbar spinal stenosis resulting in psuedoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1.

Plaintiff asserts, in a fairly conclusory manner, that he satisfies each of the three sub-parts of the listing, or, at the very least, that his condition medically equals each sub-part of the listing. (Pl.'s Mem. at 10.) However, even assuming Plaintiff meets the threshold requirement of a disorder of the spine resulting in compromise of a nerve root or the spinal cord,[8] ALJ Wexler's finding that Plaintiff does not meet or medically equal Listing 1.04 is supported by substantial evidence. Plaintiff simply cannot demonstrate that his impairment meets or medically equals the severity of any of the sub-parts of Listing 1.04.

---

[8] The Court assumes without finding that Plaintiff's diagnostic imaging is sufficient to meet the threshold requirement of 20 C.F.R. 404 Subpart P, Appendix 1.

### a. 1.04(A)

Plaintiff argues that his "symptoms demonstrate that he falls within the language of Medical Listing 1.04(A)." (Pl.'s Mem. at 9–10.) ALJ Wexler concluded that Plaintiff's post-surgery diagnostic imaging revealed only the presence of surgical hardware and mild disc bulging at the L2-L3 and L3-L4 levels, so, coupled with the medical record in its entirety, Plaintiff does not suffer from a limitation to the degree required by Listing 1.04(A). (Tr. 21.) This determination is supported by substantial evidence in the record, and nothing Plaintiff cites undermines ALJ Wexler's conclusion.

Plaintiff points to pre-surgery imaging as support that he meets or equals Listing 1.04(A). However, unlike ALJ Wexler, he failed to recognize that post-surgery imaging showed that the severity of the initially documented conditions did not persist after his surgery.[9] And, the reports of positive straight leg raising tests and reduced pinprick sensations that Plaintiff identifies in his brief are not persuasive. First, several physicians, including Plaintiff's treating neurosurgeon Dr. Lefkowitz and Dr. Singh, instead noted that Plaintiff had intact sensation, reflexes, and a negative sitting straight-leg test. (See Tr. 284–85, 290.) Furthermore, there is simply no evidence of the required motor loss or muscle weakness. Even Plaintiff's Comprehensive Pain Management doctors (whom Plaintiff asserts should be given more credence than Dr. Lefkowitz) consistently remarked that Plaintiff retained at least 4+/5 motor strength, and that his strength improved on his left side over time. (See Tr. 354, 361, 366, 398, 434, 446, 453, 458, 462.) Thus, a few instances of reduced pinprick sensations and positive leg raising tests alone are insufficient to demonstrate that Plaintiff meets or equals the severity of Listing 1.04(A).

---

[9] Considering Plaintiff's alleged onset date of November 1, 2012, any impairments that were only present prior to his surgery in March 2013 would not have lasted at least twelve months as required to find him disabled under the Act. See 42 U.S.C. § 423(d)(1)(A).

### b. 1.04(B)

Plaintiff also argues that he "exhibits the symptoms of . . . spinal arachnoiditus [sic]" to support that he meets or equals Listing 1.04(B). (Pl.'s Mem. at 11.) However, as ALJ Wexler recognized, there is no operative note, pathology report, or imaging present in the medical record to document the presence of spinal arachnoiditis, and one of those is expressly required to meet Listing 1.04(B). (See Tr. 21.) Plaintiff's bare contention that he exhibits symptoms of spinal arachnoiditis is insufficient to show he meets or medically equals Listing 1.04(B).[10] Accordingly, ALJ Wexler's determination that Plaintiff's condition did not equal or medically meet the requirements of Listing 1.04(B) is supported by substantial evidence.

### c. 1.04(C)

Finally, the record also belies Plaintiff's claim that he meets or medically equals Listing 1.04(C) because there is no evidence in the record demonstrating Plaintiff's "inability to ambulate effectively" as defined by 1.00(B)(2)(b). Plaintiff points to his reported difficulty walking distances, and that he sometimes uses a back brace to engage in strenuous activity to argue that he meets or medically equals Listing 1.04(C).[11] (See Pl.'s Mem 11–12.) However, these limitations are insufficient to demonstrate that he cannot ambulate effectively as defined by the regulations.

"Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 100(B)(2)(b)(1). The record contains no evidence that Plaintiff uses <u>hand-held</u> assistive

---

[10] Notably, even if Plaintiff's report to Dr. Singh that he can only sit, stand, and walk for ten minutes at a time meant he would have to change positions at least twelve times in two hours, he would still need a confirmed diagnosis of spinal arachnoiditis to meet Listing 1.04(B). (See Pl.'s Mem. at 10.)

[11] Plaintiff's brief greatly exaggerates the record in this respect, as it claims that Plaintiff <u>always</u> walks with a back brace, and that the pain associated with walking even one block is intolerable. (Pl.'s Mem. at 11–12.) These extreme claims are not supported by any evidence in the record.

devices to ambulate, let alone a device that limits the functioning of both his upper extremities.[12] ALJ Wexler confirmed this observation, highlighting that a neurologist found that Plaintiff "walked with a normal gait and did not require the use of a cane, walker, or crutches to ambulate" and that "[a]lthough [his] gait was at time described as antalgic, there is nothing in the medical record to suggest that he required use of an assistive walking device that limited the functioning of both upper extremities." (Tr. 21.) Thus, ALJ Wexler's determination that Plaintiff's limitations do not meet or equal Listing 1.04(C) is supported by substantial evidence in the record.

Accordingly, ALJ Wexler's determination that Plaintiff's conditions do not meet or medically equals any of the subparts of Listing 1.04 is supported by substantial evidence.

### 2. The RFC Determination is Based on Substantial Evidence

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." Barry v. Colvin, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order); see Crocco v. Berryhill, No 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017) (stating that an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis) (citing 20 C.F.R. § 404.1545(b)). In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." Crocco, 2017 WL 1097082, at *15; see also Barry, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective

---

[12] The only reference to Petitioner's use of a device to assist ambulation is a note by Dr. Lefkowitz shortly after Plaintiff's surgery, which stated that Plaintiff was able to ambulate independently but used a cane to assist ambulation. (Tr. 242.) However, this note only refers to one cane, and all the subsequent evidence directly supports ALJ Wexler's finding, including Dr. Singh's examination on January 14, 2014, which revealed that Plaintiff did not use a cane, walker, or crutches to ambulate, and Plaintiff's own testimony at the hearing that he does not use a cane, but sometimes wears a back brace for strenuous activity. (Tr. 44, 285.)

complaints of pain.") (quoting 20 C.F.R. § 416.945(a)(3)). Accordingly, the ALJ's RFC assessment is based on a review of the entire record, and she retains the final responsibility for determining Plaintiff's RFC. See 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."). An RFC determination must be affirmed on appeal where, as here, it is supported by substantial evidence in the record. Barry, 606 F. App'x at 622 n.1.

Plaintiff contends that ALJ Wexler's RFC assessment is not supported by substantial evidence. (Pl.'s Mem. at 6–8, 11–14.) He first claims that ALJ Wexler erred in weighing the medical evidence. Plaintiff then asserts that ALJ Wexler failed to properly assess his credibility. Neither argument is meritorious, as ALJ Wexler's RFC assessment is supported by substantial evidence.

### a. ALJ Wexler Properly Weighed the Medical Evidence in the Record

Though difficult to parse from Plaintiff's brief, his argument regarding the medical evidence appears to be that the opinions of the Comprehensive Pain Management doctors should have been given more weight. (Pl.'s Mem. at 6–8, 12–13.) However, the "opinions" of Dr. Thomas and Dr. Mandelbaum are merely conclusory reports to the Workers' Compensation Board that Plaintiff was temporarily disabled and could not return to work, which are not "medical opinions" as defined by the regulations. See 20 C.F.R. § 404.1527(a)(1), (d)(1) (noting that opinions that a claimant is disabled are not medical opinions as defined by the regulations). They did not identify any limitations caused by Plaintiff's impairments for ALJ Wexler to consider in

formulating the RFC. Thus, these "opinions" are not entitled to any special weight. 20 C.F.R. § 404.1527(d)(3); SSR 96-5p (S.S.A. July 2, 1996), 1996 WL 374183.[13]

Indeed, none of Plaintiff's other treating physicians offered a medical opinion as defined by the regulations, so there was no opinion entitled to "controlling weight." See 20 C.F.R. § 404.1527(c)(2). Thus, considering ALJ Wexler's detailed analysis of the medical evidence, it is clear that she properly considered the entire medical record and appropriately exercised her discretion in resolving any conflicts in the record. Veino, 312 F.3d at 588 ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). She thoroughly explained the weight she gave to the different medical evidence, all of which was reasonable considering the record as a whole. (See Tr. 22–29.) Her RFC assessment was supported by Dr. Lefkowitz's reports, the diagnostic evidence, and the opinions of Dr. Singh and Dr. Katzman. (See Id.) Furthermore, the medical records from Comprehensive Pain Management, which Plaintiff suggests ALJ Wexler should have found to be more probative than those from Dr. Lefkowitz, are not inconsistent with the RFC finding that Plaintiff can perform sedentary work so long as he does not kneel, couch, or crawl, and takes a five-minute break each hour to change positions. Thus, the Court rejects Plaintiff's claim that ALJ Wexler improperly weighed the medical evidence.

### b. ALJ Wexler Properly Evaluated Plaintiff's Subjective Complaints

Plaintiff's next appears to challenge ALJ Wexler's credibility assessment, specifically arguing that she did not appropriately consider that his reported side-effects from his medication would impair his ability to perform a sedentary job. This argument also fails. ALJ Wexler followed the two-step inquiry outlined in the regulations and found that although Plaintiff's "medically determinable impairment could reasonably be expected to cause some of the alleged

---

[13]  The same is true for the other opinions in the record that Plaintiff was disabled.

symptoms . . . [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 22.) ALJ Wexler considered the relevant factors, see 20 C.F.R. § 404.1529(c)(i)-(vii), and her finding is supported by substantial evidence.

For example, ALJ Wexler considered Plaintiff's hearing testimony that his medications caused drowsiness and impeded his ability to function normally in her assessment of the record. (See Tr. 22.) However, Plaintiff never reported such side-effects to any of his doctors.[14] While Dr. Thomas' Initial Report to the Workers' Compensation Board made a note that Plaintiff's medication causes drowsiness, (Tr. 423), none of Dr. Thomas' subsequent reports mention any side effects. Furthermore, during several follow-up visits, Plaintiff reported to both Dr. Mandelbaum and Dr. Thomas that he was tolerating his medication well and was not experiencing side effects. (Tr. 305, 397, 452.) Accordingly, Plaintiff has not demonstrated that ALJ Wexler erred in her credibility assessment.

ALJ Wexler thus appropriately considered the record as a whole, assessing the "objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background" in determining Plaintiff's RFC. Crocco, 2017 WL 1097082, at *15. As outlined herein, her assessment is supported by substantial evidence and Plaintiff certainly has not satisfied his burden at step four to show that he has a more limited RFC.

### 3. The Commissioner Sustained His Burden at Step Five

Finally, Plaintiff contends that the Commissioner failed to sustain his burden to show that there is other gainful work in the national economy which Plaintiff could perform. Specifically,

---

[14] In fact, the only instance in the medical record in which Plaintiff reported side effects from medication was in April 2013, just after his surgery, when Plaintiff noted that his Percocet was causing constipation. (Tr. 210.) There is no indication this limited Plaintiff's functioning in any way, and Percocet is not one of Plaintiff's continuing medications.

Plaintiff argues that "the positions provided by the Vocational Expert are inconsistent with the numerous restrictions placed on [Plaintiff] by all treating doctors, as well as the restrictions placed on [Plaintiff] by the ALJ." (Pl.'s Mem. at 12.) Plaintiff argues that he experiences pain "when either [sic] sitting for prolonged periods of time" and that the fatigue inducing medications "would seriously compromise his ability to perform the jobs suggested by the [VE]." (Id.) This claim also fails. As discussed supra, ALJ Wexler's RFC assessment was supported by substantial evidence. (See Section II.C.2.) Accordingly, ALJ Wexler properly relied on the VE in finding at step five that a significant number of jobs existed in the national economy that Plaintiff could perform. Snyder v. Colvin, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order) (citing Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983)). ALJ Wexler thus properly found that Plaintiff was not disabled under the Act.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for judgment on the pleadings and GRANTS the Commissioner's motion for summary judgment on the pleadings. The Clerk of the Court is directed to enter judgment in favor of the Commissioner and close the case.

**SO ORDERED.**

Dated: September 12, 2019
Central Islip, New York

　　　　　　　　　　　　　　　　　　　　/s/ (JMA)　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　JOAN M. AZRACK
　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE